IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 15-cv-01949-RBJ-MJW

CARL HALL,

    Plaintiff,

v.

JOHN OLIVER, and
FEDERAL BUREAU OF PRISONS,

    Defendants.

---

**AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW, and ORDER FOR ENTRY OF JUDGMENT**

---

This case was tried to the Court July 17-19, 2017. At the conclusion of plaintiff's evidence the Court granted the defendants' motion for judgment on partial findings under Fed. R. Civ. P. 52(c). The Court announced its findings of fact and conclusions of law from the bench. *See* ECF No. 172 (transcript). Plaintiff subsequently filed a motion for reconsideration or a new trial, citing Rules 52(b), 59(e) and 60(b). ECF No. 169. Because I agree with the plaintiff that in at least one respect the Court misspoke, I am now issuing amended findings which correct the error. However, while the amended findings reorganize and clean up the oral rulings somewhat, the substance of the findings and conclusions has not changed.

## BACKGROUND

Carl Hall is an inmate at the United States Penitentiary Administrative Maximum Facility ("ADX") in Florence, Colorado. Mr. Hall filed this case pro se against the Federal Bureau of

Prisons ("BOP") and several BOP personnel in September 2015, and he filed amended complaints in November 2015 and March 2016. ECF Nos. 1, 14, 40. The Court later granted Mr. Hall's motion to appoint pro bono counsel, and counsel entered an appearance in December 2016. ECF Nos. 99, 105. Through his attorney, Mr. Hall filed his Third Amended Complaint on March 6, 2017, which became the operative complaint in this case. ECF No. 123. One procedural change introduced in the Third Amended Complaint was that plaintiff claimed that he was seeking injunctive relief pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 et seq. *Id.* at 3.[1] In terms of substance, Mr. Hall alleged that he suffers from mental illness, but despite that, defendants have placed him in near-solitary confinement at the ADX with deliberate indifference to his mental health. He also asserted that defendants have provided medically unnecessary antipsychotic drugs as a reward for good behavior, and that they have withheld the drugs as punishment. Mr. Hall alleged that this placement in ADX and inappropriate psychological care have exacerbated his mental health issues. He raised two

---

[1] In its oral findings and conclusions the Court stated that an APA claim had not been pled. ECF No. 172 at 8. Plaintiff reminds the Court that the Third Amended Complaint does state that he seeks injunctive relief under the APA. ECF No. 169-1 at 7 n.2. Defendants respond that the reference to the APA was in the jurisdiction section, and that the relief plaintiff claims to seek under the APA (a transfer out of the ADX) is prohibited by 18 U.S.C. §§ 3621(b) and 3625. ECF No. 179 at 4-6. Plaintiff does not address the latter argument in his reply. Instead, he argues that he couldn't bring the First Amendment claim under *Bivens* because an implied right of action under the First Amendment has never been recognized. ECF No. 181 at 2. *Bivens* is irrelevant, because the Third Amended Complaint does not seek damages. Had defendants perceived that plaintiff was seeking a transfer out of the ADX under the APA, and had they called the Court's attention to the statutes that appear to foreclose the APA as a source of the remedy plaintiff sought, the Court might have granted summary judgment on the First Amendment claim. But despite plaintiff's insistence now that the Court should have conducted judicial review on the administrative record rather than conducting a "de novo" trial, the case was not presented for review on an administrative record. Rather, plaintiff presented numerous witnesses and documents and submitted the case, without dispute, on the trial evidence. The Court tried the case that was presented to it. In any event, in its oral findings and conclusions the Court expressly determined that there was no proof of arbitrary and capricious conduct or an abuse of discretion even if the case were viewed as an APA case. ECF No. 172 at 8 (transcript). That remains the case today. In short, the procedural rubric made no difference to the outcome. Judgment was and is appropriate in favor of the defendants either way.

claims for injunctive and declaratory relief: (1) an Eighth Amendment claim for failure to provide adequate mental health care, and (2) a First Amendment claim for keeping him in solitary confinement at the ADX. *Id.* at 10-13. The injunctive relief he sought was an order that defendants transfer him from the ADX to a different facility. *Id.* at 12.

Defendants filed a motion to dismiss both claims and a motion for summary judgment on the First Amendment claim. The Court ruled on those dispositive motions on April 21, 2017. ECF No. 142. The Court dismissed the Eighth Amendment claim for the reasons set forth in the written order. Briefly, in *Cunningham vs. Federal Bureau of Prisons*, No. 12-CV-1570-RPM (D. Colo.), ADX inmates including Mr. Hall challenged the adequacy of medical and mental health treatment they were receiving. On June 15, 2015 Judge Matsch approved a settlement of that case in which ADX officials agreed to make changes designed to improve the mental health treatment of inmates at the ADX in exchange for a complete and final release of all claims related to those issues. This Court concluded that the terms of the settlement barred Mr. Hall's Eighth Amendment Claim in the present case. *Id.* at 4-7, 13.

The Court, however, did not dismiss the second claim for a violation of Mr. Hall's rights of association under the First Amendment. *Id.* at 7-13. That claim was tried and is the subject of the findings and conclusions that follow.

## STANDARD OF REVIEW – Rule 52(c)

Rule 52(c) of the Federal Rules of Civil Procedure, entitled "Judgment on Partial Findings, provides:

> If a party has been fully heard on an issue during a non-jury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however,

3

decline to render any judgment until the close of the evidence. A judgment on
partial findings must be supported by findings of fact and conclusions of law as
required by Rule 52(a).

Based on the findings and conclusions set forth originally from the bench and restated herein, this Court entered judgment on partial findings in favor of the defendants.

## STANDARD OF REVIEW – The Right of Association

As I discussed in ruling on the dispositive motions, the "constitutional right of association" protects "the formation and preservation of certain kinds of highly personal relationships." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). "[T]he constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others." *Roberts*, 468 U.S. at 619. Between the poles of close familial relationships and attenuated business contacts "lies a broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State." *Id.* at 620. For example, some courts have extended this protection to personal friendships. *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 598 (6th Cir. 2013).

However, the Supreme Court has also stated that "freedom of association is among the rights least compatible with incarceration." *Overton*, 539 U.S. at 131. Indeed, "First Amendment associational rights . . . must give way to the reasonable considerations of penal management." *Jones v. N. Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132 (1977). These rights "may be curtailed whenever the institution's officials, in the exercise of their informed discretion, reasonably conclude that such associations, whether through group meetings

or otherwise, possess the likelihood of disruption to prison order or stability, or otherwise interfere with the legitimate penological objectives of the prison environment." *Id.*

Courts determine whether a restriction on an inmate's associational rights is reasonable by evaluating four factors: 1) whether there is a "valid, rational connection" between the government action and a legitimate government interest; 2) whether alternative means of exercising the asserted right remain open to the inmate; 3) what impact an accommodation of the right would have on guards, other inmates, and prison resources; and 4) whether there are "ready alternatives" that would accommodate the prisoner's right, such that the restriction is an "exaggerated response" to prison concerns. *Turner v. Safley*, 482 U.S. 78, 89–91 (1987).

**FINDINGS OF FACT**

I will organize my findings of fact according to the four *Turner* factors.

**A. Whether there is a "valid, rational connection" between the government action and a legitimate government interest.**

The first of the four *Turner* factors has been viewed as the most important. "[I]t is 'not simply a consideration to be weighed but rather an essential requirement.'"*Al-Owhali v. Holder*, 687 F.3d 1236, 1240 (10th Cir. 2012) (quoting *Boles v. Neet,* 486 F.3d 1178, 1187 (10th Cir. 2010). Legitimate penological interests include security, rehabilitation, and deterrence. *Mosier v. Maynard*, 937 F.2d 1521, 1525 (10th Cir. 1991).

1. Security.

According to the evidence presented at trial, Mr. Hall was first incarcerated in the United States Bureau of Prisons system in the year 2000. He is currently serving a 40-year sentence for a racketeering conviction. There is no reason to say much about the nature of the crime other

than to say that the evidence was that predicate acts supporting that racketeering conviction included some form or forms of assaultive behavior. I refer to testimony from Mark Collins, the Associate Warden of USP Florence, and to Exhibit ZZ.

Mr. Collins also testified that most federal prisons are considered to be open facilities in the sense that inmates in the general population of an open facility have a great deal of freedom of movement, privileges, and so forth. But if an inmate has been found to be so disruptive, assaultive, violent, or dangerous that he creates safety concerns for himself, other inmates, prison staff, or the facility itself, then he can be transferred to a Special Management Unit or SMU. According to Mr. Collins, SMUs are not for punishment, per se, but rather are "designed to curtail negative behavior to prepare inmates to return to open population."

In 2009 Mr. Hall was transferred to USP Oakdale, which is, or at least has, a Special Management Unit. Mr. Hall was ultimately housed in at least three different SMUs -- USP Oakdale, USP Florence, and USP Lewisburg -- between 2009 and 2015.

In June 2015 Mr. Hall was transferred to the ADX.[2] The ADX is where the most violent, dangerous, and disruptive inmates in the federal prison system are housed. Mr. Collins estimated that only one-third of one percent of all federal inmates are housed at the ADX. According to Mr. Collins, one reason for the reassignment of Mr. Hall to the ADX was that he failed satisfactorily to complete the SMU program at any of the three facilities where he had been housed within a reasonable time. The reasonable amount of time to complete the SMU program and to be returned to general population in an open facility is generally 18 to 24 months. Mr.

---

[2] While both are at Florence, Colorado, USP Florence and the ADX are different facilities.

Hall did not complete it during his first term. He received three extensions of time, but after the third extension, a fourth request for extension was denied.

The evidence is, and the Court finds, that while he was in the various SMU units, there were 137 different incident reports. These are not just contacts with staff about some offensive conduct. These are incidents written up, processed through the administrative process, and sustained. Of those incidents, eight of them were considered to be of the greatest severity. The incident history is documented in Exhibits TT, VV, and FFFF. Associate Warden Collins testified that Mr. Hall "absolutely" was one of the small fraction of federal inmates who belonged at the ADX.

Mr. Collins' testimony was not the only support for that finding. Dr. Erika Woolf, a prison psychologist, testified that Mr. Hall was transferred to the ADX because of a number of disruptive incidents. Dr. Charlotte Francia, another prison psychologist, testified that while Mr. Hall was in the SMU, one of his behaviors was throwing feces at staff. The plaintiff's own expert, Dr. Maximillian Wachtel, a psychologist, acknowledged that throwing feces at staff is an active assault and is dangerous because of disease potential.

In his argument in opposition to the motion for judgment on partial pleadings, Mr. Hall's counsel suggested that Mr. Hall's failure to complete the SMU program was the sole reason for his reassignment to the ADX.[3] Certainly that was a significant reason. If the SMU is where they send people who are particularly disruptive or dangerous and they fail there, it would not make sense to transfer them right back into general population in an open facility. However, the evidence established that there is an additional process that is conducted before someone is

---

[3] That argument is repeated in plaintiff's brief in support of his post-trial motion for reconsideration. *See* ECF No. 169-1 at 11-12.

transferred to the ADX. That process includes input from multiple people including mental health professionals. It also includes the right to what defendants characterize as a "due process hearing" before a hearing officer. It includes the right of the inmate to appeal if the hearing officer recommends transfer to the ADX. All of that occurred in this case.

Significantly, Mr. Collins – whose testimony I found to be entirely credible – testified that if anyone in the process determines that it's inappropriate to put an individual in the ADX, he doesn't go to the ADX. If he has flunked out of the SMU, I don't know exactly what they do and where they put him, but it isn't going to be at the ADX according to Mr. Collins. As regards Mr. Hall, it is undisputed that he has been diagnosed with a mental illness – Antisocial Personality Disorder, often referred to as ASPD. For that reason, among others, there was a mental health input into the decision as to whether to send him to the ADX. That is where Dr. Francia came in. She determined that a transfer to the ADX was appropriate for Mr. Hall.

The only "evidence" that potentially supported the plaintiff on this point was a document purportedly authored by Patti Butterfield, an administrator in the psychology services branch of the Bureau of Prisons.[4] On August 27th of 2014, Ms. Butterfield completed a form concerning whether, from a mental health standpoint, it was appropriate to send Mr. Hall to the ADX. The form includes four check boxes: first, that ADX Florence placement would interfere with the inmate's participation in necessary mental health treatment interventions; second, that his mental

---

[4] In his post-trial motion for reconsideration plaintiff argues that it is significant that Dr. Francia did not characterize ASPD as a "serious" mental illness. *See* ECF No. 169-1 at 9-11. Actually, Dr. Francia's report entitled Psychological Evaluation for ADX Placement," Exhibit 2, expresses her opinion that Mr. Hall "does not appear to suffer from a serious mental illness *that would preclude him from being housed in a locked down setting.*" See ECF No. 169-1 at 11 (emphasis added). The significant point is that all three prison psychologists who testified (Drs. Francia, Woolf, and Peterson) found the ADX to be an appropriate placement for him. The plaintiff's psychological expert, Dr. Wachtel, while viewing ASPD as a "serious" illness, agreed that placement in general population in an open facility would be inappropriate. He had no suggestion for any other placement than the ADX.

health disorder or cognitive limitations make it unlikely he could successfully progress through ADX Florence; third, that ADX Florence placement is likely to exacerbate his mental health condition; and, fourth, that none of the above conditions apply. Checking any of the first three of the four boxes would express the opinion that transfer to the ADX would not be appropriate.

The document which purports to be the report from Ms. Butterfield has a check in the box indicating that ADX placement is likely to exacerbate Mr. Hall's mental health condition. If that was in fact what Mr. Butterfield checked, then according to Mr. Collins, Mr. Hall would not have been sent to the ADX. That document was attached to a pleading filed in this case by Mr. Hall when he was still representing himself pro se. ECF No. 40-3.

It turns out, however, and the Court finds to a preponderance of the evidence, that the original document was altered. I find that the original and true document is Exhibit BBBB-00931. In the original form Ms. Butterfield checked the box indicating that none of the reasons as to why Mr. Hall should not be sent to the ADX applies. If one looks at the false document and compares it to what I now find to have been the original, it is fairly obvious that something is amiss. The false document has a big line on it, apparently from the copying process. The box indicating none of the conditions applies is not complete and appears to have been hand-drawn, at least in part. The circumstantial evidence is that it was altered by Mr. Hall, since the only copy that has ever surfaced with the box indicating that ADX placement is likely to exacerbate Mr. Hall's mental health condition checked was the one attached as an exhibit to his amended complaint. I do not have sufficient evidence comfortably to make that finding, but I absolutely find that the document purporting to express Ms. Butterfield's opinion that transfer to the ADX would not be appropriate is a phony.

9

The false document took on a life of its own when it was shown to the plaintiff's expert, Dr. Wachtel. Dr. Wachtel testified that he relied on the document. If a person in the psychology services determined that it would be inappropriate to send Mr. Hall to ADX for mental health reasons, naturally that would be something of importance to Dr. Wachtel. However, Dr. Wachtel to that extent was duped.

In sum, plaintiff produced no credible evidence that it was inappropriate to transfer Mr. Hall to the ADX or that there was a more appropriate placement elsewhere. Security concerns created by Mr. Hall's own behavior supported the ADX placement.

2. Rehabilitation.

As I said, there is no dispute that Mr. Hall suffers from Antisocial Personality Disorder. I also mentioned that Dr. Francia, a psychologist, determined before the transfer that he was appropriate for the ADX. *See* Exhibit BBBB, page 0093. So did Ms. Butterfield.

Dr. Woolf testified that there are many treatment options available at the ADX to help Mr. Hall modify his behavior. Indeed, Dr. Woolf told us that since he's arrived at the ADX, he's had fewer incident reports, suggesting that he's doing better. However, Dr. Woolf testified and Mr. Hall's currently assigned psychologist Dr. Kimble also indicated in documentation, that Mr. Hall has repeatedly refused and resisted treatment.

Dr. Wachtel, plaintiff's expert and first witness, testified that Mr. Hall is manipulative, exaggerates his mental health symptoms, and does so because he sees it as a way to get out of the ADX. He acknowledged that Mr. Hall could learn to change his behavior. Dr. Woolf testified that she treated Mr. Hall from the moment of his arrival in the ADX in the summer of 2015 all the way through January or February 2017 when she went on maternity leave. During that time

10

she has had, by her testimony, literally hundreds of interactions with him. She indicated that her goal was always to get Mr. Hall to engage in treatment so that he can get out of the ADX. Dr. Woolf also testified that she believes that Mr. Hall has opportunities for better treatment for his mental health issues at the ADX than he likely would get elsewhere. The reason is that the heightened level of security at the ADX permits Dr. Woolf, Dr. Francia, Dr. Kimble, and the other mental health staff to have more and closer interactions with inmates because they feel safe.

The latter point is perhaps best illustrated by testimony of Dr. Wachtel. He visited the ADX, and he observed the facility that has been set up in a gymnasium for group mental health treatment. He described it as a series of cages that he characterized as "horrifying." The evidence includes a photograph of a series of closed units arranged in a semicircle, each meant to contain an inmate during a group treatment session. I do not doubt that the arrangement he witnessed might strike a psychologist who is not familiar with treatment of inmates in such a facility as horrifying. But Dr. Woolf explained that the so-called "cages" provides the necessary level of security so that the inmates can't harm each other or staff while they engage in group therapy, can talk with each other, and can exchange ideas with each other. From her professional standpoint, it is a necessary and positive way to provided group mental health therapy for inmates who pose security concerns. I found her explanation to be credible.

Finally, I again note that the class action settlement on behalf of mentally ill inmates at the ADX guarantees implementation of additional mental health treatment reforms. It includes monitoring requirements. Interestingly, one individual who will serve as a compliance monitor is a psychologist who wrote one of the literature articles cited by Dr. Wachtel.

11

3. Deterrence.

The Court makes no findings one way or the other on the deterrence component of the first *Turner* factor.

4. Conclusion as to the first *Turner* factor.

Based solely on the evidence presented by the plaintiff's witnesses and documents admitted during the plaintiff's case, the facts strongly support a finding that Mr. Hall's transfer to the ADX was appropriate from a security standpoint. The facts also support a finding that the transfer was appropriate from a rehabilitation standpoint. The Court finds to a preponderance of the evidence that there is a "valid, rational connection" between the decision to transfer and maintain Mr. Hall at the ADX and legitimate penological interests.

**B. Whether Alternative Means of Exercising the Asserted Right Remain Open to the Inmate.**

It was estimated by Dr. Woolf that the inmates at the ADX spend 15 to 20 hours per week outside their cell. They have interactions with other inmates and staff when they go to group treatment, when they go to recreation, and when they engage in educational programming on a group basis. They also have interaction with other inmates just by oral communication from their cell. Having noted those things, however, it is obvious to the Court that interaction among inmates at the ADX is restricted.

Mr. Hall testified about additional restrictions that have been placed on him at the present time. For example, currently he is not permitted to have visits from family members or friends. He does get visits from a volunteer from the community, but that is all. He is permitted only one phone call per month, limited to 15 minutes.

12

The fact is, however, that the restrictions on his visitation and telephone rights are not permanent or, necessarily, for a long period of time. Mr. Collins explained that the privileges were withdrawn because of Mr. Hall's behavior, and the only way that the prison has to deal with particularly disruptive behaviors at the ADX is to withdraw privileges. But every 90 days those privileges are reviewed and can be and are changed. If the inmate cooperates, the privileges are restored. Not all privileges, by the way, have been taken away from Mr. Hall. He has a television set, and we heard from Mr. Collins about a substantial array of television programming that is available to him. He can go to the law library and in that setting associate with others. He can have books. He can have newspapers. He can attend educational programs. If he behaves, he can participate in group therapy.

Restrictions on one's right of association are inevitable in a maximum security prison. But the Court finds that the restrictions applicable to Mr. Hall are greater than average even in that setting due to his own behavior. Plaintiff's counsel disagrees. He has suggested that Mr. Hall can't help himself, that he is a victim of his illness, that he cannot curb his impulses, and, therefore, that he cannot behave. Thus, the argument continues, Mr. Hall not only cannot benefit from the privileges and freedoms that might otherwise be available, but he cannot successfully participate in the ADX's "Stepdown Program" in which inmates earn their way out of the ADX. However, the Court finds that the evidence does not support that argument.

Looked at in its very best light, one could possibly interpret Dr. Wachtel's testimony as expressing some degree of doubt as to whether some of the behavioral problems are beyond Mr. Hall's control. By the same token, however, Dr. Wachtel believes that Mr. Hall is manipulative and acts in ways that he thinks might help him get out of the ADX. Each of the other mental

health professionals who testified during plaintiff's case -- Dr. Woolf, Dr. Francia, and Dr. Tiffany Peterson – testified that she believes that Mr. Hall can control these behaviors, and that he can change his behavior if he wishes to do so.

In sum, the second factor is the factor most nearly supportive of Mr. Hall, but at best it's neutral, and at worst even the second factor under the *Turner* case supports the defendants.

**C. What Impact an Accommodation of the Right Would Have on Guards, Other Inmates, and Prison Resources.**

If this Court were to order that Mr. Hall be removed from the ADX and sent elsewhere, having heard from his own expert that he is deceptive, manipulative and has done whatever he can just to accomplish that very objective, what kind of precedent would that set? What kind of effect would such a precedent have on the prison? I find that the third factor weighs heavily against what is being requested in the context of the evidence in this case.

Mr. Collins mentioned that placement in the ADX is more expensive than other facilities. Plaintiff suggests that accommodation of Mr. Hall's wishes would therefore have a positive effect on the federal fisc. The problem is, Mr. Collins also testified that while placement in the ADX is more expensive than placement elsewhere, overall it is more cost efficient to do that rather than having disruptive inmates spread out across the country.

**D. Whether there are "Ready Alternatives" that would Accommodate the Prisoner's Right, Such that the Restriction is an "Exaggerated Response" to Prison Concerns.**

Plaintiff presented no evidence that there is any alternative that makes more sense than the ADX at this time. I repeat that even Dr. Wachtel did not offer any reasonable alternative.

The ADX does have the Stepdown Program that exists for the very purpose of giving the inmate a road out.  Mr. Collins testified that the vast majority of inmates at the ADX take advantage of the Stepdown Program and get out of the ADX.  Absent any credible evidence that Mr. Hall is incapable of participating and successfully completing that program because of his Antisocial Personality Disorder, then he can create his own alternative when he is ready and willing to do so.

## CONCLUSIONS OF LAW

The Court's conclusions of law are implicit in its findings of fact.  Applying the *Turner* factors to the evidence presented during plaintiff's case, he did not prove – or come close to proving – that his constitutional right of association has been violated.  He did not prove – or come close to proving – that defendants' decisions to transfer him to the ADX and, to date, to maintain his assignment to the ADX – were arbitrary, capricious, abuses of discretion, or in any manner in violation of the Administrative Procedure Act.  The decision to transfer Mr. Hall to the ADX was supported by substantial evidence.

Running a high-security prison is a difficult proposition.  There are dangers and difficulties for everyone involved: the inmates, the staff, the facility.  It is not for the Courts to be running our prison system.  Courts do have an important role in applying the Constitution, and if those involved in running the prison system stray from what the Constitution commands, then it's up to the Court to do something about it.  However, plaintiff provided no basis in fact or law for the Court to do what he asks – mandate a transfer of Mr. Hall to a different facility.  In the circumstances, this Court finds and concludes that it would be irresponsible to do that.

As indicated above, Rule 52(c) mandates that the plaintiff must have been fully heard before the Court is permitted to enter judgment on partial findings. The Court finds and concludes that he has been fully heard. He has been represented by counsel, appointed pro bono under the Court's Civil Pro Bono Program. Upon his appointment counsel reviewed the case, concluded that as originally pled the claims were inappropriate, reconstituted the plaintiff's claim in the form of the Third Amended Complaint, and vigorously represented Mr. Hall from that point forward. Mr. Hall testified at trial, and through counsel he called an expert witness, Dr. Wachtel, and numerous people associated with the Bureau of Prisons. He had his day in court.

## ORDER

Defendants' motion made orally at the conclusion of plaintiff's evidence at trial for judgment on partial findings is granted. The Court directs that judgment enter in favor of the defendants dismissing this case and all claims therein with prejudice. As the prevailing party, the Court awards reasonable costs under Federal Rule 54(d)(1) and local Rule 54(1) to the defendants.

DATED this 29th day of August, 2017.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge